**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **DAILEY** | * |
| | * |
| *Plaintiff,* | * |
| v. | Case No. 1:25-cv-1828-JMC |
| | * |
| **ELKTON SNF, LLC, ET AL.** | * |
| | * |
| *Defendants.* | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Shirley Dailey ("Plaintiff") initiated the present lawsuit on June 9, 2024, against her former employer, Elkton SNF, LLC and its affiliate, Elkton Health Holdco LLC ("Defendants"). (ECF No. 1). The lawsuit arises from alleged hostile work environment discrimination, adverse employment decision discrimination, failure to accommodate, and retaliation in connection with Plaintiff's leg amputation disability. *Id.* Plaintiff asserts unlawful disability discrimination and adverse employment decision violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA") and Md. Code Ann., State Gov't § 20-601, et seq. ("MFEPA" or "FEPA") (Count I); unlawful failure to accommodate violations of the ADA and MFEPA (Count II); and unlawful retaliation violations of the ADA and MFEPA (Count III). (ECF No. 1). Presently before the Court is Defendants' Motion to Partially Dismiss Counts I and II. (ECF No. 16). The motion has been fully briefed (ECF Nos. 16, 17, 18) and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons set forth herein, Defendants' Motion to Partially Dismiss (ECF No. 16) shall be denied.

## I.     BACKGROUND

Defendants employed Plaintiff at the Elkton Nursing and Rehabilitation Center from some time before January 2021 to July 22, 2024.  (ECF No. 1 at 3, 8 ).[1] After suffering an adverse reaction to two Covid-19 vaccine injections, Plaintiff "underwent a below-the-knee amputation of her right leg" on March 7, 2022. *Id.* at 4. Three days later, she "underwent a second amputation of the right leg, this time above her knee.  *Id.*  Plaintiff sought leave under the Family Medical Leave Act for her recovery from the amputation, which she was granted.  *Id.* at 5. While on leave, Plaintiff "underwent physical therapy and was fitted with a prosthetic leg." *Id.*

Plaintiff returned to work on July 19, 2022, as a Full-Time Licensed Practical Nurse.  *Id.* Upon returning to work, now with an amputated leg, Plaintiff alleges Defendants granted Plaintiff "reasonable accommodations" that would "allow her to transition into a role where she was not required to perform the physically demanding functions of her job."  *Id.* at 9. Then, "[l]ess than a week after returning to work, [Plaintiff] received a letter stating that her employment status was being changed from Full-Time Licensed Practical Nurse to Part-Time Practical Nurse."  *Id.* at 5. Plaintiff asserts she was "internally referred to as a 'clinical assistant.'" *Id.*  Plaintiff asserts that in May of 2023, her employment status changed again to a "Full-Time Minimum Data Set Coordinator." *Id.* at 6.

Plaintiff asserts that "Defendants subjected her to a work environment that was severely and pervasively hostile and offensive based upon her disability and need for accommodation."  *Id.* Specifically, the "handicap parking space reserved for [Plaintiff] was frequently used by other employees who were not disabled, and [Plaintiff] was yelled at and derided when she asked them to move."  *Id.* "On one occasion, an employee of Defendants saw [Plaintiff's] attire and asked,

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. Where a document does not have an electronic filing stamp, the Court is referring to the page numbers at the bottom of the document.

'why would you wear a dress with that?' referring to her prosthetic leg." *Id.* According to Plaintiff, she reported "this hostile work environment to her supervisors via email on January 31, 2024" and "sent a follow-up email [on] February 12, 2024." *Id.* According to Plaintiff, "both emails unequivocally complained of discriminatory mistreatment" and were both "unanswered." *Id.*

In March of 2024, Plaintiff's employment status was "changed once more…to Full-Time Infection Prevention and Control/Quality Assurance." *Id.* at 6-7. She "acknowledged and agreed to this change only after being told she would be terminated if she refused." *Id.* at 7. With respect to this position, Plaintiff asserts Defendants assured her that "she would receive adequate training, assistance, and credentialing to succeed in her new roles, which were outside of [her] expertise, qualifications, and licensed scope of practice." *Id.* Plaintiff "respectfully emailed Defendants multiple times from March 2024 through July 2024 expressing concerns as to the lack of training and assistance she received in her new role." [2] *Id.* Then, "[a]fter one such email, [Plaintiff] was written up for not ensuring that other nurses were charting properly even though [she] was never informed this responsibility was included in her new position." *Id.* With respect to training, Defendants told Plaintiff "to attend her job training courses on zoom while actively working at the facility, making it impossible for [Plaintiff] to devote adequate time to trainings." *Id.* Plaintiff further alleges that despite an accommodation that sought to allow her to transition into a role that

---

[2] Plaintiff alleges she also reported "many problems at the facility" including

> Dirty ice chests used by residents with standing water present, a lack of clean paper towels for nurses to dry their hands after washing, a cracked shower seat, dirty curtains in residents' rooms, mold on scooters used by residents, dirty fridges in the nutrition room, an incident where a nurse hit a resident with her car and remained employed by the facility, nurses refusing to clean the showers between their use by residents, maintenance refusing to sanitize ice machines, nurses not charting appropriately, nurses not washing their hands, glucometers not being cleaned in between uses, bedpans not being cleaned, and infections not being documented correctly by doctors and nurses at the facility.

(ECF No. 1 at 7).

did not require her to "perform the physically demanding functions of her job," she "routinely worked 12-hour days at the Defendants' command. *Id.* at 9-10.

While working as a Full-Time Infection Prevention and Control/Quality Assurance, Plaintiff learned that one of her new responsibilities included "adding certain papers to employee files." *Id.* at 8. When doing so, she "discovered the facility only had employee files from 2018 onward and her own employment file was missing." *Id.* "After informing Defendants, [Plaintiff] was instructed to get rid of those files because, 'the state will feed on what is there.'" *Id.* Thereafter, Plaintiff "expressed frustration and confusion via email on July 12, 2024, regarding her task of 'getting rid of' the employee files amongst other complaints of disability discrimination." *Id.* Plaintiff alleges that on that same day, she "was written up for insubordination and suspended pending an investigation." *Id.* Then, Plaintiff was "terminated on July 22, 2024" after the investigation was complete. *Id.*

With the foregoing facts in mind, Plaintiff contends she has been the target of discrimination because "Defendants created and maintained a workplace pervaded by severely hostile and offensive harassment of [Plaintiff] based upon her disability and request for accommodation." *Id.* at 10. Plaintiff "promptly filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination and retaliation." *Id.* at 8. Thereafter, the EEOC issued a "Right to Sue" letter on March 21, 2025. (ECF No. 1-2 at 2).

Defendants move to partially dismiss Counts I and II on four grounds: (1) "any alleged acts before August 17, 2022, are untimely and cannot support [Plaintiff's] FEPA harassment claim, as asserted in Count I, while any acts before October 22, 2023, are untimely for purposes of the remainder of her asserted ADA and FEPA claims in Counts I and II (and also Count III)"; (2) the

Complaint fails to "allege the kind of disability-related abuse or hostility needed to support a viable harassment or hostile work environment claim under the ADA or FEPA, as asserted in Count I"; (3) the Complaint "fails to identify the nature of [Plaintiff's] granted accommodation or how the Defendants supposedly interfered with that accommodation, as required under the ADA and FEPA to state a failure-to-accommodate claim, as raised in Count II"; and (4) the Complaint "does not allege any facts or details to support an inference that anyone discriminated against her as part of Defendants' decision to terminate her employment *two years* after Plaintiff returned to work, as raised as part of Count I.[3]" (ECF No. 16-1 at 2) (emphasis in original).

## II.    LEGAL STANDARD

The purpose of Federal Rule of Civil Procedure 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotations omitted). To survive a Rule 12(b)(6) motion to dismiss, "detailed factual allegations are not required, but a plaintiff must provide the grounds of his entitlement to relief," which requires "more than labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 561–62 (D. Md. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)) (internal quotations omitted). In considering a motion to dismiss, "the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole." *Humphrey v. Nat'l Flood Ins. Program*, 885 F. Supp. 133, 136 (D. Md. 1995) (internal citations omitted). The Court must also construe the facts and reasonable

---

[3] The Court considers each argument in the same order as set forth in the Complaint and the elements necessary to prove each Count.

inferences from the facts in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Petry*, 597 F. Supp. 2d at 562 ("Once a claim has been stated adequately . . . it may be supported by showing any set of facts consistent with the allegations in the complaint.") (quoting *Twombly*, 550 U.S. at 546).

### III.    ANALYSIS

#### A.    Untimeliness

Defendants urge this Court to dismiss or strike acts alleged before August 17, 2022, or October 22, 2023. (ECF No. 16-1 at 5). In doing so, Defendants correctly point out that the ADA and MFEPA require charges of discrimination to be filed within 300 days of any alleged discriminatory act. *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1); Md. Code Ann., State Gov't §§ 20-1004(c)(1), (c)(2). They also correctly point out that MFEPA creates a two-year time period in which to file a charge for claims of a hostile work environment. Md. Code Ann., State Gov't § 20-1004(c)(3). Regarding hostile work environment claims, the Supreme Court recognized that so long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Accordingly, when "the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." *Id.* at 118.

In the Court's view, Plaintiff first alleges acts that constitute a hostile work environment sometime between May of 2023 and January 31, 2024. (ECF No. 1 at 6). Regarding the position changes, Plaintiff argues Defendants engaged in discriminatory conduct, in part, by "constantly changing her employment position and duties." (ECF No. 17-1 at 10). Consistent with *National Railroad*, Plaintiff alleges this series of position changes constitutes the same series of alleged

discriminatory acts. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 118. Indeed, she pleads multiple position changes after returning to work from her recovery, and some of those position changes occurred directly after Plaintiff complaint of the alleged discriminatory treatment. (ECF No. 1 at 5-7). Therefore, the Court does not find it appropriate to dismiss the allegation regarding Plaintiff's position change in May 2023. Though Defendants may be able to rebut Plaintiff's argument after developing a factual record, Plaintiff is entitled to plead her theory of her case.

Moreover, while Defendants are correct that both the handicap-space incident and the specific example of the employee who asked Plaintiff "why [she would] wear a dress with that?" are undated, Plaintiff alleges she "reported this hostile work environment to her supervisors via email [on] January 31, 2024" and again on "February 12, 2024." (ECF No. 1 at 6). Even if the acts occurred well before those dates, Plaintiff alleges she reported them to Defendants in early 2024 and received no response twice. *Id. National Railroad* makes clear that these acts, which are at least as part of a series of alleged discriminatory acts that created a hostile work environment, may be considered in determining liability, even if they occurred outside of the 300-day timeframe.[4] *Nat'l R.R. Passenger Corp.*, 536 U.S. at 118. Regarding the allegations about Plaintiff's original position title, hospitalization, recovery, and return to work, (occurring before October 22, 2023), the Court considers these facts relevant background. *Id.* at 113 ("Nor does the [ADA] bar an employee from using the prior acts as background evidence in support of a timely claim."). Therefore, Defendant's motion to dismiss or strike acts alleged before August 17, 2022, or October 22, 2023, is denied.

    **B.**    **Plaintiff Pleads a Plausible Hostile Work Environment Claim under the ADA and MFEPA.**

---

[4] Considering that MFEPA permits a longer time frame in which to file of two years, the conduct alleged is sufficient under MFEPA too.

Courts generally apply the standards for Title VII to disparate treatment discrimination claims under the ADA. *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) ("Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—courts have routinely used Title VII precedent in ADA cases"). To allege a cause of action based on a hostile work environment under the ADA, a plaintiff must allege (1) that she is a qualified individual with a disability, (2) that she was subject to unwelcome harassment, (3) the harassment was based on her disability, (4) the harassment was severe or pervasive, and (5) some factual basis exists to impute liability for the harassment to the employer. *Id.* at 177. At the motion to dismiss stage, a plaintiff is not required "to plead facts establishing a prima facie case of discrimination to survive a motion to dismiss." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015).

That Plaintiff is a qualified individual with a disability and that the alleged harassment was unwelcome is not in dispute. Defendants dispute (1) whether the alleged harassment was based on Plaintiff's disability and (2) whether the alleged harassment was the type of severe and pervasive conduct required to plead a cognizable ADA claim for a hostile work environment. (ECF No. 16-1 at 14-16).

1. At the Motion to Dismiss Stage, Plaintiff Pleads Sufficient Facts to Support an Inference that the Alleged Harassment was Based on Her Disability.

Plaintiff raises several examples to underscore her hostile work environment claim. They include (1) the parking-lot incident in which Plaintiff asked employees parked in her reserved handicap space to move, and when she did so, they yelled at and derided her; (2) Plaintiff's job responsibility and title changes; (3) being overworked; (4) Defendants' failure to stop the alleged

8

harassment, and (5) an instance in which an employee asked Plaintiff "why would you wear a dress with that?" referring to her prosthetic leg.  (ECF No. 6, 9-10).

While Plaintiff need not plead a *prima facie* case, Plaintiff must allege that the purported harassment was because of her disability.  *Jennings*, 482 F.3d 686, 723 (4th Cir. 2007); *see also Ruffin v. Lockheed Martin Corp.* 126 F. Supp. 3d 521, 530 (D. Md. 2015) (recognizing that a hostile work environment claim must allege "factual allegations that the hostile work environment was because of" a plaintiff's protected status). In *Coleman v. Kettler Management*, the Eastern District of Virginia considered whether the alleged harassment was "based on" the Plaintiff's disability.  *Coleman v. Keller Management*, Civil Action No. 1:22-cv-84 (RDA/JFA), 2022 WL 17585780, at *7 (E.D. Va. Dec. 12, 2022). There, the court applied a "but for" test, recognizing that "a plaintiff must show that 'but for' her disability, she would not have been the victim of the purported harassment."  *Id.* There, the plaintiff alleged "her supervisors harassed her due to her disability 'since [they] were specifically attacking her disabled status and her working from home, which was Plaintiff's reasonable accommodation request for her disability.'" *Id.* On those facts, the court concluded that the complaint failed to allege facts that could support an inference that the mistreatment was "because of" the plaintiff's disability rather than her work-from-home status." *Id.* It reasoned in part that the plaintiff failed to allege any derogatory comments regarding her disability or any insinuation that she was not productive due to her disability.  *Id.*  On that issue, the court concluded that at best, the plaintiff's "allegations suggest that her supervisors mistreated her due to their negative opinion of employees who work remotely." *Id.*

In contrast, *Myers v. Maryland Auto Insurance Fund* recognized that criticisms implying disabled employees are not productive or overstate the nature of the disability can be considered "disability-based harassment."  *Myers v. Maryland Auto Ins. Fund.*, No. CCB-09-3391, 2010 WL

3120070, at *7 (D. Md. Aug. 9, 2010). Likewise, in *Sood v. Tempur Sealy International, Inc.*, the Middle District of North Carolina concluded that the alleged harassment satisfied the but for test when the plaintiff with a medical disability exacerbated by stress alleged

> [Plaintiff] was reprimanded based on false allegations…in November 2018 (*id*. ¶¶ 46, 49); he was yelled and cursed at for failing to perform job duties that he was not assigned (*id*. ¶ 62); his supervisors consistently ignored and disregarded his doctor's recommendations, including by forcing him to lift heavy objects despite medical restrictions, about which he complained (*id*. ¶¶ 41–42, 90)…he was issued a PIP without justification (*id*. ¶¶ 58–60); and he was terminated without justification (*id*. ¶¶ 64, 65).

*Sood v. Tempur Sealy International, Inc*., 1:19-cv-1248, 2020 WL 5633356, at *4 (M.D. N. C. Sep. 21, 2020).

There, the court reasoned that at the motion to dismiss stage, the allegations that defendants ignored the plaintiff's requests for reasonable accommodations after becoming aware of his disability and forcing him to perform work outside of his job description against medical recommendations satisfied the but for test. *Id*.

Here, *Coleman*, *Meyers*, and *Sood* provide guidance. First, construing the Complaint liberally, the Court considers each act of alleged discrimination as part of the purported pattern of discrimination as a mere pretext to oust Plaintiff from the work environment. (ECF No. 1 at 9-10). Regarding the parking-lot incident, this particular event presents a close question. Under *Sood*, where the court reasoned that "but for" the plaintiff's accommodated disability, the alleged harassment would not have occurred, it is appropriate at this stage to extend the same reasoning here. *Sood*, 2020 WL 5633356, at *4. In this instance, it is reasonable to infer that but for Plaintiff's disability (allegedly accommodated by reserving the handicap space), employees would not have yelled at and derided her when she asked them to move out of her reserved space. The Court recognizes the possibility that discovery may reveal this is more like a *Coleman* scenario in which

the only supported inference was one of discrimination based on the work-from-home status and not the disability. *Coleman*, 2022 WL 17585780, at *7. But the Court is not prepared to draw such a conclusion at the pleading stage and considering Plaintiff's theory as a whole. *Sood*, 2020 WL 5633356, at *4. Given the apparent nexus between Plaintiff's disability, employee conduct, and alleged pattern of treatment, the Court concludes it is at least plausible to infer the alleged harassment was based on her disability.

The Court applies the same reasoning to the allegations Defendants changed her position, withheld training, overworked her, and ignored her emails about the alleged harassment. (ECF No. 1 at 9-10). The Court recognizes that discovery will shed light on why exactly Defendants began changing Plaintiff's job position, work responsibilities, training requirements, and work hours after she returned to work with accommodations for an amputated leg. Indeed, Plaintiff pleads that these changes occurred only after she returned to work with an amputated leg. (*See generally* ECF No. 1). Plaintiff pleads that her accommodations sought to "transition her into a role where she was not required to perform the physically demanding functions of her job" after returning from a long recovery period of physical therapy and doctor's visits. *Id.* at 9. While the allegations here do not involve the same explicit connection between the doctor-recommended accommodations and the defendant's clear disregard for them that occurred in *Sood*, this Court concludes that as a matter of pleading, Plaintiff's allegations are not so dissimilar as to warrant dismissal on this prong. *See Sood*, 2020 WL 5633356, at *4.

Likewise, Court finds that the comment "Why would you wear a dress with that?" referring to Plaintiff's prosthetic leg is "because of" her disability. The Court does not agree with Defendant's argument that this allegation is "perhaps" related to her disability. (ECF No. 16-1 at 15). The allegation specifically pleads that the comment refers to her prosthetic leg. (ECF No. 1

at 6).    Under *Coleman* and *Myers*, Plaintiff adequately pleads facts sufficient to support an

inference that her disability is the but-for cause of this comment.    *Coleman*, 2022 WL 17585780,

at *7; *Myers*, 2010 WL 3120070, at *7.    Accordingly, at the motion to dismiss stage, Plaintiff

sufficiently pleads the "based on" element of the hostile work environment claim.

        2.    At the Motion to Dismiss Stage, Plaintiff Pleads Sufficient Facts
            Regarding Severe and Pervasive Conduct.

"The severe or pervasive standard is a rigorous one" that involves both an objective and

subjective component.    *Peterson v. Capital One, N.A.*, 705 F.Supp.3d 484, 500 (D. Md. 2023)

(internal quotations omitted).    When considering whether conduct was objectively severe or

pervasive, "[a] court must weigh all the circumstances of the harassing conduct, including 'the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance.'"    *Id.*  (quoting *EEOC v. Rite Aid Corp.*, 750 F.Supp.2d 564, 572

(D. Md. 2010)) (alterations in original).    Moreover, "simple teasing, offhand comments, and

isolated incidents (unless extremely serious)" do not meet the bar for severe or pervasive conduct.

*EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).

Defendants characterize the allegations in the Complaint as follows:

In total, Plaintiff asserts (i) that someone sometime before January 2024 once made
a comment about her dress that perhaps related to her disability, (ii) that
unidentified employees sometimes parked in her "reserved" handicap parking spot,
(iii) that some of those unidentified individuals "yelled at and derided [her] when
she asked them to move," (iv) that Defendants supposedly overworked her and
modified her work responsibilities to the point it prevented her from being able to
take advantage of (unidentified) accommodations granted to her, and (iv)[sic]
general, conclusory allegations that "employees made degrading comments and
harassed [her] incessantly and without recourse."

(ECF No. 16-1 at 15).

According to Defendants, these "allegations do not come close to showing a hostile, abusive, or even an unreasonable work environment." *Id.*

Several cases provide context for what a plaintiff must allege to clear the severe and pervasive bar at the pleading stage. *E.g.*, *Sood*, 2020 WL 5366656, at *5; *Bluey v. Charles Cnty. Md.*, Civil Action No. DKC 19-3163, 2020 WL 5203334, at *10-*11 (D. Md. Sep. 1, 2020); *Gagnon v. Bd. of Educ. of Montgomery Cty.*, 760 F. Supp. 3d 359, 374-75 (D. Md. 2024). In *Sood*, the court recognized that the plaintiff did "not allege any facts showing threats, humiliation, or offensive utterances based on his disability," but he did allege "the harassment he experienced was frequent, pervasive, physically harmful, and interfered with his ability to perform his job at the motion to dismiss stage. *Sood*, 2020 WL 5366656, at *5. Similarly, in *Bluey v. Charles County, Maryland*, this Court found that the alleged conduct was severe and pervasive at the motion to dismiss stage when the plaintiff asserted that in a six-month period, she was reprimanded when "she did nothing wrong," that the defendants ignored or denied her repeated requests for accommodation, and that she was subjected to arbitrary medical exams and documentation requirements. *Bluey*, 2020 WL 5203334, at *10-*11. The Court noted that the plaintiff "seem[ed] to treat the incidents as all contributing to a hostile work environment in incorporating her entire recitation of events into [the hostile work environment Count]." *Id.* at *10. The Court also recognized that if "taken independently, they may seem like 'isolated personnel decisions.'" *Id.* at *11. Accordingly, the *Bluey* Court concluded that the allegations "all occurring within a sufficiently short period of time, are sufficiently pervasive and serve to form a plausible claim for a hostile work environment." *Id.*

In support of Defendants' characterization that the allegations do not come close to even an unreasonable work environment, they rely on *Perkins v. International Paper Company*,[5] in which the Fourth Circuit affirmed the dismissal of a hostile work environment claim when the employer denied the employee's request for retroactive application of benefits, promotion requests, and disparately questioned the plaintiff about overtime, all occurring sometime between 2007 and 2013. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209 (4th Cir. 2019). They also rely on *Gagnon v. Board of Education of Montgomery County*, in which this Court dismissed a hostile work environment claim when the plaintiff pled one comment that could be related to her disability, her supervisor condoned students who made fun of her disability by failing to address it, and that the defendant denied accommodations she requested were not enough to constitute "harassment that inflicted the kind of humiliation, ridicule, or intimidation that generally characterizes severe or pervasive harassment." *Gagnon v*, 760 F. Supp. 3d at 374-75.

Under these circumstances, the Court disagrees Defendants' characterization of the facts pled in the Complaint.[6]  It cannot be said that the "allegations do not come close to showing a hostile, abusive, or even an unreasonable work environment," as Defendants insist.  (ECF No. 16-

---

[5] Recognizing the unique differences between disability discrimination and race discrimination, the Court seeks factual context from other disability-related cases. Though these cases provide helpful statements of law, they cannot provide the same factual guidance as disability discrimination cases.

[6] Defendants assert in their Reply that Plaintiff's characterization of the Complaint also stretches the allegations too far. (ECF No. 18 at 4).  To that end, in Plaintiff's Opposition Motion,  Plaintiff argues,

> Specifically, [Plaintiff] was forced to hobble across the parking lot after Defendants' non-disabled employees blocked her access to "handicap" parking before screaming at and deriding her for asking them to move their cars… Defendants' employees also frequently mocked Ms. Dailey's prosthetic leg and taunted her by asking "why would you wear a dress with that?"

(ECF No. 17-1 at 16).

There is no allegation that Plaintiff "was forced to hobble across the parking lot" in connection with this incident. There is also no allegation that employees "frequently mocked" Plaintiff's leg.  (*See* ECF No. 1.) As "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss," *McDonald v. LG Elecs. USA, Inc.*, 219 F. Supp. 3d 533, 541 (D. Md. 2016), the Court considers the allegations as set forth in the Complaint.

1 at 15).  As in *Bluey*, the Court recognizes that Plaintiff's theory of her hostile work environment claim imputes each instance of the alleged harassment to Count I.  *Bluey*, 2020 WL 5203334, at *10.   Though she was not physically threatened, Plaintiff does allege that she was "yelled at and derided" when she asked employees to move out of her reserved handicap.  (ECF No. 1 at 6). While Plaintiff does not plead how many times these parking-lot incidents occurred, she does allege that multiple "employees" "frequently" used her handicap space. *Id.*   Construing the Complaint liberally, the allegations are sufficient to support an inference that the yelling, deriding, and degrading comments occurred at some frequency and that the examples Plaintiff pleads are not the only illustrations of the alleged harassment.  Similarly, at the motion to dismiss stage, it is reasonable to infer that this kind of conduct would be humiliating for a recent amputee. Additionally, Plaintiff alleges—as one specific example—an occasion in which an employee asked "why would you wear a dress with that? Referring to her prosthetic leg." *Id.*  Then, like in *Bluey*, she alleges two instances in which she reported her complaints about the work environment to Defendants, and they did not respond.  *Bluey*, 2020 WL 5203334, at *11.

Plaintiff asserts a higher level of abuse than the *Perkins* plaintiff, who sought relief for an employer's denial of benefits, promotions, and questioned the plaintiff about overtime over the course of five years. *Perkins*, 936 F.3d at 209.  Indeed, the allegations present more than a simple case of Plaintiff being denied certain work-related benefits. *Id.* Defendants' reliance on *Gagnon* is somewhat more compelling.  While the plaintiff there pled one comment that could be related to her disability, Plaintiff here asserts a comment refers directly to her prosthetic leg.  *Gagnon*, 760 F. Supp. 3d at 374-75. When the *Gagnon* plaintiff's supervisor failed to address the student comments making fun of the plaintiff, this Court reasoned that the students' comments "were attributable to the [defendant] only to the extent that [plaintiff] made her supervisors aware of the

conduct and they failed to address it." *Id.* Here, it is well taken that Plaintiff does not plead who (supervisor, management, or colleague) made the dress comment and/or "yelled at and derided her" about the handicap spot. (ECF No. 1 at 6). Still, under *Gagnon*, these incidents are at least attributable to Defendants upon the two instances in which Plaintiff reported them directly to Defendants in January and February of 2024. *Gagnon*, 760 F. Supp. 3d at 374-75.

The Court further recognizes the six-month window in *Bluey* is shorter than the relevant timeframe here. *Bluey*, 2020 WL 5203334, at *10. Plaintiff alleges discriminatory conduct stretching over the course of two years. (ECF No. 1 at 5-9). Nonetheless, it is clear that Plaintiff theorizes a pattern of discriminatory conduct (including job changes, training obstacles, and ridicule from staff) reached a boiling point during the months of January 2024 through July of 2024 after Plaintiff made requests that Defendants address the alleged harassment. (ECF No. 1 at 5-9). While the allegations here are not identical conduct pled in *Sood* and *Bluey*, this Court views these allegations as more like those set forth in *Sood* and *Bluey* than in *Perkins* and *Gagnon*. At this stage, the Court cannot conclude that Plaintiff failed to plead facts sufficient to at least warrant discovery to clarify what exactly occurred and why.

Therefore, Defendants' Motion to Dismiss as to the hostile work environment claim under the ADA and MFEPA[7] is denied.

### C.    Plaintiff Pleads Plausible Adverse Employment Decision Claims under the ADA and MFEPA.

To state a claim for an adverse employment decision based on discrimination under the ADA, Plaintiff must allege facts that make it plausible that (1) she was a qualified person with a

---

[7] Considering that the ADA imposes a higher bar than MFEPA claims, the Court extends this reasoning to the MEPA claim. *Jennings*, 679 F.Supp. at 275 (recognizing that compared to a Rehabilitation Act claim, which is closely related to the ADA, "MFEPA's "on the basis of" standard is more relaxed and permits mixed-motive arguments.").

disability, (2) she was suffered an adverse employment decision, (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012). Defendants argue there can be no inference of discriminatory intent because Plaintiff failed to allege facts probative of a particular decision-maker's discriminatory animus. (ECF No. 16-1 at 21). Defendants argue that the allegations regarding the alleged discriminatory conduct is not enough to make a reasonable inference that a decision-maker terminated Plaintiff because of her disability. *Id.* In response, Plaintiff argues

> Each time Defendants took an explicit act against [Plaintiff] leading up to and including her termination, Defendants altered the terms, conditions, and benefits of her employment. Defendants used [Plaintiff's] inevitable struggles in her new roles as mere pretext for illegal disability discrimination because Defendants' actions were in direct response to [Plaintiff] complaining about her discriminatory work environment.

(ECF No. 17-1 at 15).

Plaintiff makes no explicit response to the Defendants' argument regarding the decision-maker's discriminatory intent. A totality review of the Complaint and Plaintiff's Opposition Motion suggests that Plaintiff relies on the allegations forming the Hostile Work Environment and Failure to Accommodate claims to establish discriminatory intent.

Courts have struggled with some difficulty to determine what facts plaintiffs must allege regarding the discriminatory intent element to survive a motion to dismiss. *E.g.*, *Meyer v. DynCorp International, LLC*, GJH-19-3412, 2020 WL 5513436, at *9-*10 (D. Md. Sep. 14, 2020). When a plaintiff pleads, as Plaintiff does here, that a defendant's explanation for termination is a mere pretext for disability discrimination, courts apply the "long-familiar shifting burdens regime of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017). Under the *McDonnell Douglas* framework,

17

when a plaintiff establishes a prima facie case showing discriminatory intent, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to show a legitimate and non-discriminatory reason for termination. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). But, at the motion to dismiss stage, this framework serves only "to inform a court's evaluation of the allegations." *Hart v. Lew*, 973 F. Supp. 2d 561, 580 (D. Md. 2013). Indeed, a "[p]laintiff need not plead facts sufficient to constitute a prima facie case under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, but courts may look to the requirements of a prima facie case as a guide in assessing the plausibility of plaintiff's claim for relief." *Craft v. Fairfax County Government*, No. 1:16CV86 (JCC/MSN), 2016 WL 1643433, at *4 (E.D. Va. Apr. 26, 2016).

Moreover, a plaintiff need not plead a particular decision-maker had a discriminatory animus to survive a motion to dismiss if other factors support such an inference. *E.g.*, *Pickering v. Va. State Police*, 59 F.Supp.3d 742, 748 (E.D. Va. Oct. 3, 2024) (finding an inference of discriminatory intent when a plaintiff was fired six weeks after diagnosis); *see also Croy v. Blue Ridge Bread, Inc.*, Civil Action No. 3:12-cv-00034, 2013 WL 3776802, at *4 (W.D. Va. Jul. 15, 2013) (considering a thirty-three day difference between diagnosis and termination to support an inference of discriminatory intent). In *Foster v. University of Maryland Eastern Shore*, this Court held that a five-month gap is "too long a period for [p]laintiff to establish a causal relationship on proximity alone." *Foster v. Univ. of Md. E. Shore*, 908 F. Supp. 2d 686, 706 (D. Md. 2012), *aff'd in part, rev'd in part on other grounds by* 787 F.3d 243 (4th Cir. 2015). Alternatively, when a plaintiff performs her job satisfactorily and the only friction revolves around a disability, that too justifies an inference of discriminatory intent at the motion to dismiss stage. *See Schmitz v.*

*Alamance-Burlington Board of Educ.*, 1:18CV910, 2020 WL 924545, at \*9 (M.D.N.C. Feb. 26, 2020) (citing *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 948 (7th Cir. 2008).

Here, the temporal proximity between diagnosis and termination alone do not support the clear inference of discriminatory intent under *Croy* and *Pickering*. *Croy*, 2013 WL 3776802, at \*4; *Pickering*, 59 F.Supp.3d at 748. Indeed, two years passed between Plaintiff's amputation and her discharge. (ECF No. 1 at 4, 8). However, Plaintiff's argument suggests that the first instance in the pattern of the alleged pattern of adverse employment decisions occurred "less than a week after returning to work" when she received a "letter stating that her employment status was being changed from Full-Time Licensed Practical Nurse to Part-Time Practical Nurse." *Id.* at 5. Later, she alleges one month after emailing Defendants in January and February of 2024 to complain of the alleged harassment, she again suffered an adverse employment decision when her "employment status was changed once more from Full-Time Licensed Practice Nurse to Full-Time Infection prevention and Control/Quality Assurance." *Id.* at 6-7. As Plaintiff pleads, she "agreed to this change only after being told she would be terminated if she refused" and she was terminated in July 2024 after emailing again "expressing concerns as to the lack of training and assistance she received in her new role." *Id.* While this is not a *Pickering* or *Croy* scenario, Plaintiff does allege a connection between her disability and the alleged pattern of adverse employment decisions, including her eventual termination. *See Schmitz*, 2020 WL 924545, at \*11 (finding a months-long gap between a plaintiff's choice to seek leave to care for her disabled son and constructive discharge was not fatal to a complaint after considering the totality of the circumstances in an associational discrimination case).

Further, Plaintiff's discriminatory intent theory does not rely solely on temporal proximity. *Id.* For example, Plaintiff alleges that during the relevant timeframe, Defendants ignored her

complaints of employees taking her reserved handicap space and the "why would you wear a dress with that?" remark. (ECF No. 1 at 6). As stated above, to the extent that Plaintiff made Defendants aware of the alleged harassment and they ignored it, such conduct is attributable to Defendants after they knew about it and did nothing. *Gagnon*, 760 F. Supp. 3d at 374-75. Recognizing that Plaintiff need not establish a prima facie case at the pleading stage, the Court is not prepared to say at this early stage that the totality of the circumstances do not at least support an inference of discriminatory intent. *See Schmitz*, 2020 WL 924545, at *11. Though discovery may prove otherwise, the Court cannot dismiss Plaintiff's claim for failure to plead the nuanced facts necessary to plead a prima facie case to which Plaintiff does not yet have access. *Craft*, 2016 WL 1643433, at *4. Therefore, Plaintiff has pled a cognizable Adverse Employment Decision Claim in Count I.

### D.    Plaintiff Alleges a Plausible Failure to Accommodate Claim.

To establish a failure to accommodate claim, a plaintiff must demonstrate (1) the plaintiff was an individual who had a disability within the meaning of the ADA; (2) the employer had notice of the disability; (3) with a reasonable accommodation the plaintiff could perform the essential functions of the position sought; and (4) the employer refused to make such an accommodation. *Wilson v. Dollar Gen. Corp*., 717 F.3d 337, 345 (4th Cir. 2013). Defendants argue Plaintiff's failure to accommodate claims fail because she (1) did "not identify the nature of her requested accommodation," or (2) "how either Defendant supposedly interfered with that accommodation." (ECF No. 16-1 at 17). Specifically, Defendants point out that an accommodation was provided. *Id.* at 19. To that end, the Complaint alleges,

> After returning from her FMLA leave, [Plaintiff] was supposedly provided accommodations. However, due to staffing shortages and workplace dysfunction created by Defendants, [Plaintiff] was unable to take advantage of these accommodations. Instead, [she] routinely worked 12-hjour days, in order to

> compensate for the dysfunction in the facility. In short, Defendants pretended to
> offer but in fact withheld workplace accommodations that could have been
> maintained without undue burden or hardship.

(ECF No. 1 at 10).

Plaintiff clarifies the accommodation was supposed "to allow her to transition into a role where she was not required to perform the physically demanding functions of her job." *Id.* at 9. Though stated in Count I, Plaintiff alleges Defendants failed to accommodate her disability by "allowing [Plaintiff's] supervisors to sabotage her workplace and prevent her from taking advantage of the accommodations awarded to her…" *Id.* For example, Plaintiff pleads "the 'handicap' parking space reserved for [her] was frequently used by other employees who were not disabled." *Id.* at 6. Considering the Complaint as a whole, it seems that (1) Defendant's act of ignoring Plaintiff's complaints about staff mistreatment; and (2) Defendants "constantly adding and changing" Plaintiff's job responsibilities; failing to train her for her changing roles; and forcing her to work long hours interfered with the purported accommodations. *Id.* at 6-9.

Defendants argue Plaintiff's failure to identify the nature of the awarded accommodation "necessarily means she cannot demonstrate an inference" that Defendants' conduct interfered with or related to her accommodation. (ECF No. 16-1 at 19). Moreover, Defendants insist "[a]bsent details about the nature of any awarded accommodation and *how* [Defendant] supposedly failed to properly implement it on account of claimed overwork and lack of training, Plaintiff cannot demonstrate that any of the Defendants refused or failed to provide her an accommodation as required under the ADA or FEPA." *Id.* (emphasis in original). Plaintiff counters, "Defendants' explicit acts and failure to act sabotaged the interactive process" and therefore interfered with her accommodations. (ECF No. 17-1 at 18).

"To trigger an employer's duty to accommodate, a disabled employee need only 'communicate[ ] [his] disability and desire for an accommodation.'" *Kelly v. Town of Abingdon, Va.*, 90 F.4th 158, 166 (4th Cir. 2024) (quoting *Jacobs*, 780 F.3d at 581) (alterations in original). Reasonable accommodations may include "job restricting, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Campbell v. Becton, Dickinson and Co.*, Civil No. 1:22-cv-3043-ELH, 2024 WL 1299354, at *25 (D. Md. Mar. 27, 2024) (internal quotations omitted). Under the ADA, there is an expectation that the employer will pursue an 'informal, interactive process' with its disabled employees to ascertain the extent of their disabilities and the range of accommodations that might address them." *Kelly*, 90 F.4th at 166 (quoting *Wilson*, 717 F.3d at 346). A defendant cannot avoid liability for failing to provide a reasonable accommodation by failing to engage in an interactive process with an employee to find a reasonable accommodation. *Campbell*, 2024 WL 1299354, at *32.

In *Campbell*, this Court denied a defendant's motion to dismiss a failure to accommodate claim. *Id.* at *31. There, the defendant urged the Court to dismiss the claim because "plaintiff never specified, proposed, or identified a reasonable accommodation." *Id.* at *32. The Court recognized that while that contention was true, the plaintiff complied with all of the defendant's requests for information about her injury, and a "defendant cannot avoid liability for failing to provide a reasonable accommodation by failing to engage in an interactive process with an employee to find a reasonable accommodation." *Id.* Accordingly, the Court concluded that siding with the

defendant's argument at the motion to dismiss stage "would deter employers from engaging in the interactive process." *Id.*

After construing the allegations liberally, the Court considers the allegations and arguments raised here to be sufficiently analogous[8] to those raised in *Campbell*. *Id.* at *31-*32. As the *Campbell* defendant, Defendants are correct that Plaintiff does not specify her granted or requested accommodation. *Id.* at *32. Plaintiff pleads she had an accommodation that would "allow her to transition into a role where she was not required to perform the physically demanding functions of her job." (ECF No. 1 at 9). The allegation that Plaintiff emailed Defendants in January and February of 2024 to complain about her lack of training does not explicitly state that she did so because she was improperly accommodated. *Id.* However, Plaintiff does allege she emailed Defendants to "report[] [the] hostile work environment" and "unequivocally complained of discriminatory mistreatment." *Id.* at 6. Rather than engaging in an interactive process with Plaintiff to clarify her complaints about the alleged harassing treatment, Defendants failed to respond to both of her emails. *Campbell*, 2024 WL 1299354, at *32; *Kelly*, 90 F.4th at 166. Moreover, allegations of working 12-hour days, adapting to a variety of new job tasks, and being prevented from using her handicap space, plausibly interferes with an accommodation that seeks to prevent her from performing physically demanding functions of her job. At this early stage, this Court cannot conclude failure to specify her exact accommodation in the Complaint is so detrimental as to warrant dismissal under *Campbell*. *Campbell*, 2024 WL 1299354, at *32.

---

[8] The Court recognizes that the dispute in *Campbell* centered around an un-granted accommodation. *Campbell*, 2024 WL 1299354, at *31-*32. That is not the case here. Plaintiff theorizes Defendants did not enforce the accommodation they purported to grant her upon her return to work, and had they done so, she could have performed her job. It may be the case that discovery proves otherwise. At this juncture, the Court must construe the Complaint liberally and afford Plaintiff plausible inferences in her favor. The Court recognizes that without discovery, Plaintiff could hardly plead every nuance of the theory she seeks to prove.

Therefore, the Motion to Partially Dismiss the ADA and MFEPA claims[9] raised in Count II is denied.

## IV.    CONCLUSION

For the reasons stated herein, Defendant's Motion to Dismiss (ECF No. 16) is DENIED. Defendants' Answer is due within fourteen (14) days of the entry of this order.

Date: October 2, 2025                                  _____/s/_____
                                                       J. Mark Coulson
                                                       United States Magistrate Judge

---

[9] "The MFEPA contains functionally identical prohibitions and is evaluated under the same framework as the Americans with Disabilities Act, 42 U.S.C. § 12112(a)." *Destiny Charity Rose Teel v. Md. Natural Treatment Solutions, LLC*, RDB-23-1694, 2024 WL 1075421, at *4 (D. Md. Mar. 12, 2024).  MFEPA claims may be analyzed under the *McDonnell Douglas* framework. *Campbell*, 2024 WL 1299354, at *27.