**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **SHIRLEY DAILEY** | * | |
| *Plaintiff,* | * | |
| v. | * | Case No. 1:25-cv-1828-JMC |
| **ELKTON SNF, LLC, ET AL.** | * | |
| *Defendants.* | * | |

* * * * * * * * * * * * * * * * *

**MEMORANDUM OPINION AND ORDER**

Plaintiff Shirley Dailey ("Plaintiff") initiated the present lawsuit on June 9, 2024, against her former employer, Elkton SNF, LLC and its affiliate, Elkton Health Holdco LLC ("Defendants"). (ECF No. 1). The lawsuit arises from alleged hostile work environment discrimination, adverse employment decision discrimination, failure to accommodate, and retaliation in connection with Plaintiff's leg amputation disability. *Id.* Plaintiffs assert unlawful disability discrimination and adverse employment decision violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA") and Md. Code Ann., State Gov't § 20-601, et seq. ("MFEPA" or "FEPA") (Count I); unlawful failure to accommodate violations of the ADA and MFEPA (Count II); and unlawful retaliation violations of the ADA and MFEPA (Count III). (ECF No. 1). On June 12, 2026, Plaintiff amended the Complaint (ECF No. 38) to include a claim for common law wrongful discharge ("Count IV"). Presently before the Court is Defendants' Motion to Partially Dismiss Count IV. (ECF No. 40). The motion has been fully briefed (ECF Nos. 40, 43, 44) and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons set forth herein, Defendants' Motion to Dismiss (ECF No. 40) shall be GRANTED.

## I. BACKGROUND

The following background incorporates the allegations added to the Amended Complaint. Defendants employed Plaintiff at the Elkton Nursing and Rehabilitation Center from some time before January 2021 to July 22, 2024. (ECF No. 38 at 3, 8 ).[1] After suffering an adverse reaction to two Covid-19 vaccine injections, Plaintiff "underwent a below-the-knee amputation of her right leg" on March 7, 2022. *Id.* at 4. Three days later, she "underwent a second amputation of the right leg, this time above her knee. *Id.* Plaintiff sought leave under the Family Medical Leave Act for her recovery from the amputation, which she was granted. *Id.* at 5. While on leave, Plaintiff "underwent physical therapy and was fitted with a prosthetic leg." *Id.*

Plaintiff returned to work on July 19, 2022, as a Full-Time Licensed Practical Nurse. *Id.* Upon returning to work, now with an amputated leg, Plaintiff alleges Defendants awarded Plaintiff "reasonable accommodations" that would "allow her to transition into a role where she was not required to perform the physically demanding functions of her job." *Id.* at 9. Then, "[l]ess than a week after returning to work, [Plaintiff] received a letter stating that her employment status was being changed from Full-Time Licensed Practical Nurse to Part-Time Practical Nurse." *Id.* at 5. Plaintiff asserts she was "internally referred to as a 'clinical assistant.'" *Id.* Plaintiff asserts that in May of 2023, her employment status changed again to a "Full-Time Minimum Data Set Coordinator." *Id.* at 6.

After several other instances and transfers not at issues under Count IV, Plaintiff alleges she incurred paperwork responsibilities. *Id.* at 8. Specifically, while working as a Full-Time Infection Prevention and Control/Quality Assurance member, Plaintiff learned that one of her new responsibilities included "adding certain papers to employee files." *Id*. When doing so, she

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. Where a document does not have an electronic filing stamp, the Court is referring to the page numbers at the bottom of the document.

"discovered the facility only had employee files from 2018 onward stored in unlocked cabinets and her own employment file was missing." *Id.* "After informing Defendants, [Plaintiff]' supervisors agreed the files should be locked" but "instructed [her] to get rid of those files because, 'the state will feed on what is there.'" *Id.* Plaintiff alleges that at the same time she made this discovery, "Defendants and their care practices were under investigation by Maryland's Attorney General." *Id.* Thereafter, Plaintiff "expressed frustration and confusion via email on July 12, 2024, regarding her task of 'getting rid of' the employee files amongst other complaints of disability discrimination." *Id.* Plaintiff alleges that on that same day, she "was written up for insubordination and suspended pending an investigation." *Id.* Then, Plaintiff was "terminated on July 22, 2024" after the investigation was complete. *Id.*

As addressed previously, Plaintiff contends she has been the target of discrimination because "Defendants created and maintained a workplace pervaded by severely hostile and offensive harassment of [Plaintiff] based upon her disability and request for accommodation." *Id.* at 10. Alternatively, in Count IV, Plaintiff asserts a claim for common law wrongful discharge against both Defendants.[2]

To that end, Plaintiff alleges that while employed by Defendnats "Ms. Dailey uncovered a scheme to destroy personnel files and obstruct the Maryland Attorney General in its investigation of Defendants' care practices." *Id.* at 12. Plaintiff "refused to participate in Defendants' illegal activity because doing so would violate her code of ethics as a Licensed Practical Nurse, codified

[2] Fed. R. Civ. P. 8(d)(2) states, "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." As will be discussed in greater detail below, Rule 8(d)(2) does not override the demands of a wrongful discharge claim, and simply purporting that such a claim is pled in the alternative does not establish that the claim is consistent with the intent of the Maryland legislature.

under COMAR 10.27.19." *Id.* She alleges that after she "reported her superiors' illegal order to destroy personnel files, Defendants terminated [Plaintiff's] employment for 'insubordination.'" *Id.*

In a Memorandum Opinion dated October 3, 2025, the Court denied Defendants' first Motion to partially Dismiss. Discovery is underway, and Plaintiff amended the Complaint by consent. *See* (ECF No. 41) (noting that Plaintiff filed the Complaint after the time in which to do so without leave of the Court). Defendants now move to dismiss Count IV.

## II. LEGAL STANDARD

The purpose of Federal Rule of Civil Procedure 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotations omitted). To survive a Rule 12(b)(6) motion to dismiss, "detailed factual allegations are not required, but a plaintiff must provide the grounds of his entitlement to relief," which requires "more than labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 561–62 (D. Md. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)) (internal quotations omitted). In considering a motion to dismiss, "the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole." *Humphrey v. Nat'l Flood Ins. Program*, 885 F. Supp. 133, 136 (D. Md. 1995) (internal citations omitted). The Court must also construe the facts and reasonable inferences from the facts in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Petry*, 597 F. Supp. 2d at 562 ("Once a claim has been stated adequately . . . it may be supported by showing any set of facts consistent with the allegations in the complaint.") (quoting *Twombly*, 550 U.S. at 546).

## III. ANALYSIS

Defendants first argue that Count IV should be dismissed because Plaintiff's statutory whistleblower remedies preclude a common law wrongful discharge claim. (ECF No. 40-1 at 6). Generally, at-will employees may be terminated for any reason by either party. *Wholey v. Sears Roebuck*, 370 Md. 38, 48, 803 A.2d 482 (2002). Yet, "[t]he tort of wrongful discharge is one exception to the well-established principle that an at-will employee may be discharged by his employer for any reason, or no reason at all." *Id.* (citing *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464 (1981)). In *Adler*, Maryland joined "the growing number of states which have adopted a 'public policy exception' to the common law notion of at-will employment" by recognizing wrongful discharge as a cause of action. *Id.* at 49. To establish wrongful discharge, an employee must show (1) a discharge, (2) the basis of that discharge has violated a clear mandate of public policy, and (3) there must be a nexus between the conduct and the employer's decision to fire the employee. *Id.* at 51; *see also Wholey*, 139 Md.App. at 649; *Yuan v. Johns Hopkins Univ.*, 452 Md. 436, 451, 157 A.3d 254 (2017). Defendants challenge the second and third elements, as well as the notion that a wrongful discharge claim is even viable.

Because the purpose of the tort of wrongful discharge serves to "provide a remedy for otherwise unremedied violations of public policy," the tort is not viable if the statutes that establish the public policy at issue "already provide an adequate and appropriate civil remedy for the wrongful discharge." *Porterfield v. Mascari II, Inc.*, 374 Md. 402, 423, 823 A.2d 590 (2003). Thus, the parties agree that a wrongful discharge claim acts as a supplementary tort that is limited "to cases where an employee's termination contravened a clear mandate of public policy and not to allow the cause of action would leave the employee without a remedy." *Newell v. Runnels*, 407 Md. 578, 647, 967 A.2d 729 (2009).

In *Paunovic v. Genesis Healthcare, LLC*, this Court considered whether a plaintiff's wrongful discharge was viable as a matter of law against the backdrop of the remedies set forth under the HCWWPA and the Fair Employment Practices Act ("FEPA"). *Paunovic v. Genesis Healthcare LLC*, Civil No. ELH-17-2448, 2018 WL 3439263, at *6 (D. Md. Jul. 17, 2018). There, the plaintiff alleged that she was eventually discharged "in retaliation and for pretextual reasons, i.e., for toasting bread," for raising concerns about certain billing practices, and for making a charge of age discrimination. *Id.* Looking at the HCWWPA, the Court reasoned that the "HCWWPA establishes a Maryland public policy of encouraging health care workers to report violations of laws, rules, and regulations by health care providers." *Id.* Indeed, the HCWWPA permits a court to (1) issue an injunction to restrain continued violation, (2) reinstate an employee to the same or an equivalent position held before the violation, (3) remove any adverse personnel record entries based on or related to the violation, (4) reinstate full fringe benefits, (5) require compensation of lost wages, benefits, and other remuneration; and (6) assess attorney's fees resulting from litigation. *See* H.O. § 1-505. Thus, the Court concluded that the HCWWPA and FEPA[3] enunciate the public policies underlying her wrongful discharge claim, thereby already providing "adequate and appropriate civil remed[ies] for the wrongful discharge" at issue. *Id.* (citing *Porterfield*, 374 Md. at 423) (internal quotations omitted). Therefore, the Court dismissed the plaintiff's independent wrongful discharge claim. *Id.*

Plaintiff urges the Court not to follow *Paunovic* because the opinion is unreported, but the Court is satisfied that *Paunovic* offers relevant guidance, as it applies the relevant statutes to the cause of action here in Maryland. *See id.* Here, Defendants argue that the Maryland False Health Claims Act, Md. Code Ann., Health-Gen. § 2-607(a) (the "MFHCA") and Health Care Worker

[3] The Court considered Maryland's FEPA statute insofar as it provided a statutory remedy for Plaintiff's age discrimination allegations. *Paunovic*, 2018 WL 3439263, at *6.

Whistleblower Protection Act, Md. Code Ann., Health Occ. §§ 1-502, 1-503 (the "HCWWPA") preclude a common law wrongful discharge claim. Defendant argues that because these two statutes provide the statutory remedies addressed in *Paunovic*, there is no need for Plaintiff to bring a common law wrongful discharge claim for the alleged violations of those acts as a matter of law.

The Amended Complaint states that the alleged public policy protection is derived from the Nursing Code of Ethics and codified at MD. CODE REGS. 10.27.19.02 (2014). Thus, Plaintiff argues that the HCWWPA and MFHCA are not the sources of public policy under Count IV. MD. CODE REGS. 10.27.19.02 requires nurses to "[p]rovide services with respect for human dignity and the uniqueness of a client unrestricted by consideration of social or economic status, religious affiliation, personal attributes, or the nature of health problems" and prohibits a nurse acting in the capacity or identity of a licensed nurse from "[k]nowingly participat[ing] in or condon[ing] dishonesty, fraud, deceit, or misrepresentation." MD. CODE REGS. 10.27.19.02(A)(1)-(B)(1).

The Court observes that the alleged wrongful practice here is the destruction of certain personnel files that are seemingly disconnected from a nurse's relationship and duties to patients; however, the Court will accept the notion that destroying personnel files at the very least would be a violation of 10.27.19.02(B)(1). Plaintiff alleges "Ms. Dailey refused to participate in Defendants' illegal activity because doing so would violate her code of ethics as a Licensed Practical Nurse, codified under COMAR 10.27.19. After Ms. Dailey reported her superiors' illegal order to destroy personnel files, Defendants terminated her employment for 'insubordination.'" (ECF No. 38 at 12).

Under *Paunovic*, whether a wrongful discharge claim is viable depends not on what public policy a plaintiff personally sought to protect; rather, it depends on whether there exist "statutes establishing the public policies underlying …[the] wrongful discharge claim" which "already

provide exclusive remedies for the claims at issue." Here, simply because Plaintiff's motivation for refusing to engage in the alleged illegal activity can be derived from her code of ethics does not mean her claim can survive. As she pleads, she was terminated for failing to join in on the alleged illegal practices. The HCWWPA protects licensed healthcare employees for this very conduct. Specifically, H.O. § 1-502(3) prohibits an employer from taking any personnel action as reprisal against an employee because the employee "[o]bjects to or refuses to participate in any activity, policy, or practice in violation of a law, rule, or regulation." Plaintiff argues that the HCWWPA cannot be the source of the operative public policy because Plaintiff did not follow the criteria set forth under H.O. § 1-503 such that she would be protected by it. However, *Paunovic* addressed a similar argument from the plaintiff there. The *Paunovic* plaintiff sought to bring a wrongful discharge claim as an alternative to her HCWWPA claim in the event that the HCWWPA was not applicable. *Paunovic*, 2018 WL 3439263, at *7. The Court rejected that argument, reiterating that "the viability of the wrongful discharge claim in Count III depends on whether the statues that enunciate the public policies underlying the claim set forth adequate remedies. If so, the statutes are the sole avenues for vindicating those public policies." *Id.* Therefore, as here, a "[P]laintiff's inability to establish a violation of a statute reflects the legislature's considered judgment that she is not entitled to relief under that statute," and "[t]he court cannot circumvent that determination by permitting plaintiff to pursue a separate wrongful discharge claim." *Id.* Thus, the Court is not persuaded by Plaintiff's attempt to distinguish this case from *Paunovic* on the basis that the Plaintiff there alleged an HCWWPA claim.

Turning to Defendant's second and third argument, it follows that the allegations concerning Plaintiff's obligations under the nursing code of ethics do not entitle her to an inference that she was discharged in violation of a clear public policy other than that provided by the

HCWWPA. There are no allegations that there was any connection between Plaintiff's decision to follow her ethics code and Defendants' motivations to fire her; to the contrary, Plaintiff alleges that it was because she reported the alleged illegal directive to destroy personnel files that she was terminated. (ECF No. 38 at 12). The Amended Complaint entitles Plaintiff only to an inference that the protected public policy at issue here is reporting or otherwise failing to heed wrongful directives in a healthcare workplace, which is actionable under the HCWWPA.

For those reasons, the Court must dismiss Count IV.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss (ECF No. 40) is GRANTED.

Date: August 10, 2026

/s/
J. Mark Coulson
United States Magistrate Judge